## ELBRO KNITTING MILLS v. SCHWARTZ.

Circuit Court of Appeals, Sixth Circuit.
January 18, 1929.

No. 5123.

Arthur E. Fixel, of Detroit, Mich. (Fixel & Fixel, of Detroit, Mich., on the brief), for appellant.

Irwin I. Cohn, of Detroit, Mich., for appellee.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

HICKS, Circuit Judge. ■ Max Grossberg was adjudged bankrupt June 1, 1927. His estate passed into the hands of Schwartz, trustee in bankruptcy. On April 26 and April 28, 1927, Elbro Knitting Mills sold Grosberg certain bathing suits, valued at the cost of $211.50. Before Grosberg's estate passed into the hands of his trustee, Schwartz, there was a receiver's sale, and these bathing suits were sold thereat, but with the understanding that the proceeds thereof were to be held in place of the merchandise. On December 1, 1927, Elbro Knitting Mills, hereinafter called petitioner, filed its amended petition, seeking to recover from the trustee the value of the property. The trustee resisted, and the petition was denied. The order denying the petition simply recites that, the petition "not having been sustained, the same is hereby denied." Petitioner sought review, and the order of the referee was confirmed. In his certificate to the judge (General Order XXVII), the referee undertakes to set out in detail the grounds upon which his general order of dismissal was based. Assuming that the referee could thus supplement the dismissal order and that we have here a concurrrent finding of the referee and judge, we do not regard ourselves strongly bound thereby, because the finding substantially embodies a deduction from facts some of which are in the record by stipulation and none of which are seriously disputed rather than conclusions upon conflicting evidence (Ohio Valley Bank v. Mack [C. C. A. 6] 163 F. 155, 158, 24 L. R. A. (N. S.) 184; Johnson v. Ellmers et al. [C. C. A. 6] 295 F. 685), and we are constrained to believe that an analysis of the evidence makes it clear to a moral certainty at least that the bankrupt, without intention or expectation of paying therefor, induced petitioner to part with his goods by concealing both his insolvency and his intention.

As to insolvency, on April 26 and 28, 1927, the date upon which he gave orders for petitioner's merchandise: The official audit, admittedly true, shows that bankrupt's inventory on January 1, 1927, was $12,107.58. Up to May 1st he purchased additional merchandise to the amount of $24,491.69. If he had sold no goods, he would have had on hand May 1st $36,599.27 worth of goods at cost. He had sold goods to the value of $14,417.82, leaving on hand $22,181.45, if he had sold at cost. But his indebtedness at that time for merchandise alone was $23,313.59, leaving a balance against him of $1,132.14, but his sales did not represent cost. If he sold these goods at all, and did not otherwise dispose of them, the sales were at a loss of sometimes as great as 50 per cent. In addition, he owed $1,760 in bank. Thirty days later he went into bankruptcy, with a total indebtedness of $28,514.19 and total assets of $15,589.65. He had failed for $12,924.54 as per his books, but the formulas of

bookkeeping are not alone to be relied upon to determine insolvency. There are other practical considerations.

■■ The audit reveals the market value of Grosberg's assets at $11,674.48, leaving a deficiency of $15,079.71 within about 30 days after the sale by petitioner. The financial condition at the time of bankruptcy is relevant evidence upon the question of solvency at any recent time prior thereto. Bailey v. Hornthal, 154 N. Y. 648, 49 N. E. 56, 61 Am. St. Rep. 645; Oppenhym & Sons v. Blake (C. C. A. 8) 157 F. 536. The failure for this large amount so soon after receipt of petitioner's goods creates an inference of insolvency at that time. That Grosberg knew he was in failing circumstances from January 1, 1927, and that he was by March or April at least clearly insolvent, is demonstrated by the stipulation as to his testimony found in the record. We quote briefly therefrom:

"On the first day of each month my bookkeeper gave me a list of the people I owed money to.

"Up to January, 1927, I always discounted my bills. After that I no longer discounted the bulk of my bills.

"Creditors pressed me for their past due bills all through January, February, March and April, 1927. I gave many of them postdated checks. When the checks came due, I was not always able to meet them and when I needed money to pay these post-dated checks, I had to sell merchandise at less than cost. I would sell goods for whatever I could get and I would not let a customer go out. This was going on all through the months of February, March and April, 1927.

"Merchandise was being sold at a loss throughout this period, sometimes goods were sold at as great a loss as 50% off cost in order to realize money for the payment of bills and post-dated checks.

"The shrinkage in my business from January 1, 1927, to the date of bankruptcy, June 1, 1927, was due to the sale of merchandise for less than cost."

Before the filing of the bankruptcy petition Grosberg told Mr. Morse "that I was busted."

That Grosberg was concealing his condition from January 1, 1927, is apparent. The last financial statement made by Grosberg to Dun & Co. was on February 28, 1926. He then listed his assets at $15,304.93, his liabilities at $5,959.53 and his net worth at $9,346.40. On February 24, 1927, Singleton, the agent of Dun & Co., called upon Grosberg for a financial statement. He did not make it; neither did he reveal that he had made an inventory as of January 1, 1927. He stated that an inventory would be taken about the end of March, 1927, and that a financial statement would be forthcoming about 30 days after that date, and that, in the absence of later papers, the former figures (those contained in the statement of February 28, 1926) were generally applicable. As a matter of fact, the figures contained in the statement of February 28, 1926, were not applicable on February 24, 1927. The official audit, which is admittedly correct, shows that on January 1, 1927, Grosberg's assets were $14,206.12, his liabilities were $9,590.62, and his surplus or net worth was $4,615.50, and beyond question his financial condition grew rapidly worse from then until bankruptcy.

Upon receipt of the order for the goods in question, petitioner applied to Dun & Co. for a report upon Grosberg's rating, and received the report on April 28, 1927. This report contained, in substance, the financial statement made by Grosberg to Dun & Co. on February 28, 1926. This report based upon Grosberg's statement to Singleton also stated, "when call was made at the former address on February 24, 1927, subject (Grosberg) stated that inventory would be taken about the end of March, 1927, and that financial statement would be forthcoming about thirty days after that date. * * * The figures" (those contained in the statement on February 28, 1926) "were accepted as a fair showing of conditions at that time and in the absence of later are considered reflective to date." Petitioner relied upon this statement which entitled Grosberg to a rating styled "G–3"; that is, from $5,000 to $10,000 surplus, and shipped the goods. In addition, Grosberg promised Singleton that he would make financial statements both in April and May. He never did.

■ As to the matter of intention:

This was a Michigan contract, to be governed by Michigan law. In Illinois Leather Co. v. Flynn, 108 Mich. 92, 65 N. W. 519, it is said:

"It is true, there is a class of cases in which it has been held that, where the natural effect of the acts of the party is to work a fraud against another, the absence of an intent to defraud is not a defense; but it is not a fraud per se for a purchaser of goods to fail to make payment, nor is it a fraud per se for a dealer to purchase goods, though insolvent, in the absence of any misrepresentation, and with the intention of pay-

ing for them; nor does the fact of a subsequent failure make the purchase fraudulent by relation. What constitutes fraud in such a case is the purpose of the buyer not to pay for the goods. This is not determined by what purpose some other, less hopeful of success in his ventures, might, under like circumstances, have entertained; but, to constitute the purchase fraudulent on this ground, there must have been an actual intent on the part of the purchaser to obtain the goods without paying for them."

In Skinner v. Michigan Hoop Co., 119 Mich. 467, 78 N. W. 547, 75 Am. St. Rep. 413, the court's charge as follows was approved:

"Where a buyer is insolvent at the time of making the contract of sale, or is in failing circumstances, and conceived the intention of not paying for the goods, or had no reasonable expectation that he could do so, and fraudulently concealed or misrepresented the facts, the sale may be rescinded by the seller, and the property recovered"—citing Belding Bros. & Co. v. Frankland, 8 Lea (76 Tenn.) 67, 41 Am. Rep. 630; Davis v. Stewart (C. C.) 8 F. 803, and Le Grande v. Bank, 81 Ala. 123, 1 So. 460, 60 Am. Rep. 140. See, also, Weidman v. Phillips, 159 Mich. 380, 386, 124 N. W. 40. Actual intent to defraud is seldom proven by positive testimony. It is more usually to be shown by circumstances or "badges" of fraud.

As indicating Grosberg's mental attitude, he incurred substantially all of his $26,754.19 indebtedness after January 1, 1927. During that period he increased the number of his creditors from 38 to 92. He made this large "overbuy" of merchandise when business "was very slow and bad," and when he was unable to discount his bills and was issuing post-dated checks and when, rather than let a customer go, he would sell merchandise at any price offered either at or below cost. He not only failed to disclose the result of the January 1, 1927, inventory, but he failed to issue new financial statements when the same were requested, and he made an affirmative false statement of his condition to the representative of Dun & Co. when he knew that his true condition was being sought as a basis for credit. As indicating his general intention, he made another statement of his condition to Shetzer, a wholesale merchant, on April 20, 1927, as of January 1, 1927, in which he reported his liabilities at $6,900 for merchandise not due. He did not disclose that at the end of March he owed for merchandise alone $17,954.66, and that his debts were still accumulating.

As a circumstance touching petitioner's claim, he procured an advanced dating for payment, and directed that the goods, which were for the most part bathing suits, be shipped by express, when there was no immediate demand for such goods at that period. Grosberg knew his financial condition, or at least must be held to have known it, for his books were properly kept beginning with March, 1927, and we conclude that he had no basis for expecting at the time he bought petitioner's goods that he would be able to pay the $23,313.59 due for merchandise alone, to say nothing of his other obligations, and avoid bankruptcy, and that he did not in fact so expect or intend. That he made some payments in May on merchandise account is of little weight, in view of the record disclosures showing that he paid only $1,067.76 thereon out of receipts for that month of $4,366.64 and the further failure of the record to show just under what circumstances the payments were made.

Upon the whole we conclude that the petition is clearly sustained by the proof and the findings of the referee and judge are reversed, and the case remanded for further proceedings in accordance herewith.